20-3434 Major Smith III v. City of Toledo, OH Arguments not to exceed 15 minutes per side Mr. Abood, you may proceed for the appellant Thank you, good morning My name is Norman Abood I represent Major Smith, the appellant in this appeal I'd like to reserve minutes for rebuttal This is a civil appeal from the District Court's grant of summary judgment thereby dismissing Major's complaint in its entirety The primary issue we submit for this court's consideration which has ramifications beyond the specific case is whether it is legally permissible for an employer in this case, the City of Toledo to racially discriminate against an employee in this case, Major Smith while the employee is undergoing remedial training and testing allowed by the employer after the employer arguably had the right to terminate the employee for failure to meet a performance standard required for continued employment The District Court determined in this case that such remedial training and testing was nothing more than a bonus an opportunity not allowed of the employees that it was simply a quote-unquote special accommodation and therefore actual evaluation of whether there was discriminatory treatment during the remedial training and testing is not necessary as the employer could simply have fired the employee in the first instance As detailed in the briefs Major Smith is an African-American He was a fire trainee at the City of Toledo Fire and Rescue Department Training Academy As such, he is a member of a legally protected class The purpose of the Academy is to train recruits in the skills necessary to become firefighters What do we do, let me ask you this question What do we do in this, I agree it's an interesting situation about the remedial testing and whether they had they weren't under an obligation I guess to do it they did it anyway I would think maybe you can't then intentionally discriminate against somebody How does the prima facie case work? Was he otherwise qualified at that point? Given that he had already failed and he could have been kicked out of the program Why is he otherwise qualified at that point in time? At that point in time, your honor the qualification standard was the qualification to be a member of the Academy He had satisfied that He was physically and academically qualified to be a recruit The purpose of the Training Academy is to train those people who have already been established as qualified and as the court has repeatedly ruled since its seminal decision in Klein you can't use the fact of a failure of a test to assert disqualification That's what the city has conflated here and I think that goes to the essence of your question So as long as he was qualified you go back to the original qualification which was he was a legitimate recruit or was qualified to be a recruit met all the requirements to go through the training and so we just revert back to that and don't worry about the fact that he couldn't pass the test the first time around Well, the Ohio Administrative Code also addresses this question I think it's I forget the exact number 4505 etc etc it's cited in the briefs that provision deals with the testing at the Fire Academy level and specifically provides that you have to pass an academic round and you have to pass a physical skills practical skills they call it round and in that code section it specifically states that if a trainee fails an evolution which is a series of three tests within that evolution he shall be remediated he shall be returned to the beginning of that so that he can be trained and tested this was specifically addressed by Battalion Chief Hitt Battalion Chief Hitt was the former head of the Training Academy for a number of years and he testified that while he was there they recognized and followed the mandate that it's a training academy the only reason in his view but that Ohio Code when it says shall be remediated or whatever the precise words are does that mean you just retake the test that you didn't pass over and over or does that mean you have to go through the whole course again I think the answer is exemplified by exactly what the city purported to do in this case which is you take the recruit outside of that evolution and you put them back through that evolution the Training Academy consists of training at two levels for state certification and to qualify to become a member a probationary firefighter in the city, in this case the City of Toledo's Fire and Rescue Department so the code is that not only they don't just retake it and Chief Hitt was very specific about this, that the standards require, the state standards and the national standards for firefighting training academies require that there be a plan of remediation so that there has to be effective retraining and then retesting it's a two-step process What do you do Council, what do you do about the evidence that he was given more training and then he said that he had had enough training that is in the record that was an expression of frustration but he did say it and he went forward but after the training and you're talking about the June evolution, this is where that comes up, the third round of three tests he was then subjected to absolutely unfair and unsafe testing protocols Chief Hitt was put there because of his qualifications and experience to observe what happened we know what happened in June we know specifically what happened in June he was put on a roof that according to Chief Hitt who was at that point a frontline battalion chief in charge of a firehouse fighting fires every day he wouldn't put a seasoned firefighter on that roof because he couldn't do the vertical ventilation cut safely, they put Major Smith on that roof we know that there were not proper spotters, proper spotters were evidenced by pictures of the training that you have a spotter an instructor directly behind the recruit who is there to assure as they're wearing these full gear with ventilation masks we're all somewhat more familiar with what it's like to wear a mask these are full ventilation masks with air tanks on their back so the steeper the roof and this roof was very steep according to Chief Hitt, that's the evidence in the record Right, but do we know that it was steeper than the roof I mean you have to show that he was treated differently than people not of his race so do we know that the roof how do we know that the roof was materially steeper than the roofs that the other recruits all passed on in March It's an interesting flipping of the evidence that the district court does. We know specifically what happened and what the conditions were in June. For the court to conclude that these were the same kinds of conditions that the white Caucasian and the other African American recruit was subjected to in March would mean that the court  had subjected the recruits in March to an unsafe roof condition, too steep that they had put their trainees through the same conditions meaning no spotters directly behind the recruit. We know that's not true because we have pictures from March showing that there were proper spotters. We have Chief Hitt's actual observations which are not contradicted and are actually confirmed by Chief Glombowski Chief Glombowski was head of the training academy in June 2018 and she was there watching all of this and she testified in her deposition and she agrees that during the training they sent Major Smith up on the roof. It was such a bad roof to begin with that they wanted him to make this cut on this steep roof without proper spotters from his non dominant side. He's right handed they wanted him to cut from the left at the edge of a roof. There is no evidence that anybody was subjected to these kinds of conditions in March. So Mr. Abboud, I didn't see and maybe you can point me to it where you raised this point about the spotters either in the district court or to us. I know that you talked about the pitch of the roof but I didn't see this point about the spotters. Can you show me where you raised that? Yes, actually this was raised during the presentation. I can find it during the break but you'll find the issue directly addressed during the oral argument on the motion for summary judgment. Judge Zuhairi asked when I said brought up the spotters he said well do you have any proof of that? We brought out the city's pictures. They produced in their briefs, their exhibits, pictures of the training in March and it shows the recruits up on a roof. I think one of them actually is Major Smith and there's a spotter it shows the proper positioning. You've got the ladder, you've got a spotter at the top, you've got the recruits that stand on this ladder with full equipment. They put a thing on the ladder they call it a foot shore but that picture is specifically in evidence and it was specifically addressed with the district court during oral argument. So it's in that and that's a relatively short transcript. And your time is up. You still have rebuttal. Thank you. Thank you, Your Honor. Jeff Charles here on behalf of the City of Toledo. I think first of all maybe it's important to start with the notion that this continues to be a case which plaintiff tells us is a conspiracy claim. Everybody is conspiring together to hurt Mr. Smith. According to Mr. Abood, we gave him six additional opportunities to pass a test which he flunked in March and which he should have been terminated then solely to denigrate him and to otherwise treat him poorly because of his race. And I think it's important to remember that the people supposedly involved in this conspiracy are all protected class members with high executive authority within the City of Toledo. Chief Byrd is an African-American Former Chief Santiago is Hispanic-American Sally Glombowski is a female Battalion Chief in charge of the Academy and Lieutenant Rodriguez, according to Mr. Abood, these people got together to conspire to harm him because of his race by giving him nine chances to attempt to pass that test. He couldn't pass the test. He was a danger to himself and others. If you look at the notes, if you look at the testimony from Smith, Smith himself, he basically says over and over again that he can't do it. He's not comfortable on that roof. The best thing we could have done for him at the end of the day was terminate him. Whether you like it or not, fighting fires is a dangerous occupation. This was a crucial skill. You want individuals who can go on that roof and danger themselves. It requires a person willing to run into burning buildings and to be confident and not someone nervous and can't start a chainsaw after nine attempts. There's no evidence in that case whatsoever that the conditions for the additional opportunities were different than the white people. The reason I start with the conspiracy because there's literally no direct evidence. He says there is, there isn't. There's really no circumstantial evidence. If you look at the notes from the roof testing, you look at what Smith said, he can't do that test. He's not comfortable up there. But he tells his court, and he told the trial court, his central fabrication in this case, if you look at page eight of his brief, he states that Smith alone, Smith alone, was required to perform a specialized skill most seasoned firefighters would have difficulty accomplishing as a state certification test. All other trainees had only to demonstrate proficiency in basic vertical ventilation skills on a simulator for state certification. That's not true. That is simply not true. The trial court politely pointed out some brazen misrepresentation. Was there any evidence that the June conditions were similar to the first test? Yes, there were. Yes, your honor. I'm not saying you would necessarily have to put that evidence in. The plaintiff would have to show, I think, that they were different. But I'm wondering if there was evidence that they were actually similar or the same from your side. Yes, your honor. First of all, Smith said that looks okay to me, and he goes up there and does it. Sally Glombowski testified it looked the same. You can see from the photographs provided by Keeve in London that the requirement is  that you have to be able to go up on a residential roof, saw a hole in it in 10 minutes, and get down without endangering yourself. That's exactly what he was required to do. No. There's no standard at 4765.20 that says it has to be 35 degrees or 40s. The roof obviously was different than March, but it wasn't significantly different. It is a misnomer. It never says anything of relevance. That's why I ignored him in my summary judgment motion. All it says when you read his report is that it's too hard for Smith. Well, clearly it was too hard for Smith, but the issue in this case is everybody else was required to do it. That's an uncontested fact, and it's a very important test. If you look at the notes... Was there any evidence that any other recruit or anybody had ever, I thought there was, had cut holes in the June roof successfully? I thought there were... Were there other holes in that roof? Yeah, I think Your Honor, what I know I think there were other holes in the roof because obviously the large class used a variety of different roofs. But there's no actual evidence. Nobody testifies that we used this roof in June for previous training or testing and 10 recruits successfully cut holes in it. No, I do not believe so, Your Honor, no. In the previous comment from Mr. Boot as to the dominant hand and all that, well, when he complained about his dominant hand, we said, okay, deal with the other hand. I just find that the whole thing rather reprehensible. But in the point, there were some questions earlier about the 4765.20. If you look at 4765.20 0-6-2-F That's where it says if the applicant is unable to pass the practical skills examination within three attempts, the applicant shall complete a new course of instruction as set forth in chapter 4765.24 and meet all criteria for a firefighter certificate. First of all, it's important to emphasize that this was not a statutory interpretation case. Assume the city's reading that correctly. I don't care because everybody had to do that test. And you can't get around the fact that the sole purpose for giving him all the additional opportunities as we stated honestly and fully on the record was because we wanted a diverse, ethnically diverse fire department. We did bend over backwards for this young man because we wanted him on the fire department. Yeah, Mr. Charles, I hear that you're very upset about the lawsuit. I understand that, but we're here and we're hearing argument. So what I'm wondering is I mean, surely it can't be the case that just because you're going to give somebody extra chances that you can then rig the test, right? You have to give them basically the same test. I mean, I understand that it can't be on the same roof because you're using real roofs. You have to give them more or less roughly the same test. And so that's what I'm really interested in is what evidence and Judge Nalbandian said is probably not your burden to show that they're the same, but what evidence do we have that they are roughly the same? Again, Battaglia Chief Glombowski testified. So did I believe Pinkham. There are a few different officers who testified in the record. I'm sorry, Glombowski testified? Glombowski. Sally Glombowski was a, you know, she was the head of the department, the training department. She testified, I believe, in her deposition. They look for a similar roof. They found a similar roof. And I think there's also testimony from I believe might have been Pinkham or whoever was up there on the last chance, the last opportunity. And I think it's important to maybe allude back to Hitt. Hitt never said it's steeper than any other roof. Hitt wanted Smith to test on a porch. I mean, Hitt's position's always bad. Look, it's just too tough to be testing on a real roof. Not that this, you know, nobody measures the slope of the roof. There's no... I think the trial court correctly pointed out that the roof appears to look like the other roofs. But no, nobody measured the roof. I can't give you a measurement for the roof, Your Honor. That's correct. Let me ask you a question. Smith tests on the same roof in May and then also in June, correct? So it's the same roof. And he bails in May. And does he at that point know that he's going to be tested again on the same roof in June? So he's been on the roof in May. He says this one feels a little steeper. He thought it looked the same. Then he got up there and he was like, oh, it felt different. Does he know then that he's going back on that same roof in June? Does he know in May he's going back on the same roof? Between May and June, he's given more training. Does he know, and then I'm going to test on this June roof, or does he ever say like, hey, that roof was too steep. Can I have a different kind of roof? No, he never says that roof's too steep. I want a different kind of roof. No, that does not happen. Was he told in May that we're going to test you again and we're going to put you on the same roof you had before? No, I do not believe so. I'm not sure if he was told which roof it was going to be. There was never an issue as to the roof until the lawsuit was filed. He didn't register any complaints about the roof after the May test, like this was too steep, it was way steeper than the one in March. No, if you look at the evidence and notes as to the testing itself and the roof itself, you basically see a person who just isn't comfortable doing it. Let's just get it over with. We're telling him over and over again how to do it. We're giving him additional instruction. There's no discussion of, gee, can we have another roof, please? That doesn't exist. It's nowhere in the record. I think the record's clear that our goal during this whole process was to help Mr. Smith to give him additional opportunities to pass. We show that by the additional instruction he got. He may not have liked the instruction, but it's above and beyond anyone else. I think the OAC statute should have been terminated back in March, but we decided to give him additional opportunities. I think he testified that he got conflicting instructions, that sometimes he was told to cut it in one direction, sometimes in a different direction. That's what he says, and then he also says he's ready to go. He wants to do it. I don't know if other candidates said they got conflicting instructions or not. The notes from the test itself indicate he's very uncomfortable out there. He cuts towards himself. He cuts through rafters. He doesn't sound the roof. What about the evidence that the timing was different for him? I guess I like that evidence, Your Honor, and the fact that we found that discrepancy after March, and Chief Santiago said, okay, let's let him do it again. I think it's important to emphasize that the timing is irrelevant because he's failing because the timing is a fact, but he's incredibly unsafe up there. He's sawing through rafters. He's not sawing the roof. He can't operate that chainsaw no matter how many chances we give him. Then he meets with the mayor and says, let's give him another chance. We're trying to get this young man on our fire department. That was our goal. That's what the evidence shows, not that we're trying to somehow harm him or treat him negatively in a disparate fashion. Mr. Charles, Chief Hitt testified that in his time they wouldn't have put them up to test any recruit until they were ready to pass, until they were sure that they were going to pass. It seems like the policy changed at some point. You get a set amount of training, and everybody gets the set amount of training, but when it's time to take the test, you take the test. When did that policy change? First of all, I don't think there was any policy change whatsoever. I think if you listen to that comment by Hitt, it doesn't make any sense on his face. You have to have the statute that says people take tests and they pass or they flunk. Hitt's honest in that sense. He wants us to test until they pass. You have a curriculum. You have a schedule. You have people entering. You get so many attempts, then you fail. There's no evidence in the record that a policy changed. I don't know how he could have ever set it up so... If somebody comes through that's just incompetent at a particular school, you can't just keep testing that person over and over. It just doesn't make any common sense. If I'm at law school, if I fail a test, I fail the test. At least they get three different chances. I don't think there's any evidence that anything ever changed whatsoever. I hope that answers your question. I'm sorry. Let me interrupt. I don't know how much time I got left. A minute. Just a summary. I think the city's position has always been very plain. I think the trial court got it correct. Slope is a slope. Roof is a roof. A test is a test. We gave him many, many additional chances. If you look at Smith's testimony, he basically just wasn't cut out to do this. Any evidence that talks about these peripheral issues never get us to the roof. We did not work to harm this individual. We worked to try to get him out of the fire department. We went over backwards to help him. Thank you very much. What about the spotters? There was a test in June. There was somebody up on the roof. To be honest, I don't know what he's referring to. I think he's making it up. There's somebody on the roof. Somebody on the roof started a chainsaw for him. There's no evidence as to how many spotters were present at the other locations as well. There's no comparison whatsoever. Again, he failed not because of a spotter or lack of a spotter, but because of his inability to do the test. Your claim is that there were spotters on the roof in June? Yeah, there was somebody up on there. I don't know who or what Hitt's calling a spotter. There was somebody on the roof in June. I believe they started a chainsaw for him again. He wasn't out there by himself. I'm sure of that. Yes, Your Honor. Any other questions? No. Okay. Thank you very much. Thank you very much. Rebuttal? Thank you, Your Honor. Let's start with the last point. In June, there is absolute evidence as I referenced in the pictures of the marked test with two spotters properly positioned, one above, one directly below and to the side of the trainee. There's no evidence. Let me ask a question. How do we know that that's the proper position? Where does that come from? Is there some manual that says there shall be spotters in these spots or something? It's testified to in Hitt's deposition and document 42-2, page ID 931, is the first page of the training report for Major Smith III compiled by Chief David Hitt based upon his actual observations and his education and experience as to what happened in the June evolution and his evaluation of the records relative to the March evolution. And he specifically testifies that he reviewed those March documents compiled by the city and found that there were discrepancies in the testing. Major had indicated to him that there was problems with the instruction, inconsistent instruction, told it one time to do it this way, next time a different way, a lot of confusion. He reviewed the, he Hitt reviewed the records, found there was inconsistencies in the testing, took that to then Chief Santiago who said, yes, he deserves additional testing. There's a lot of conflation of the facts here. Wait, wait, I'm sorry. That memo concerned which two tests? Chief Hitt was the observer, appointed observer for the June evolution. He first talks, it's a three page report. He talks about his evaluation of the records for the March evolution and he talks about his observations of the June evolution. But then after that you said, and someone agreed that there should be another test. Yes. He went to Santiago. When he looked at the records in early May, the records of the March test, he went to Chief Santiago who said, yes, he deserves to be, he brought those to the Chief's attention. The Chief then said, no, we're still going to fire him. Now, this is why there's a sequence of... I'm sorry, you're confusing me. I know. I thought you said, just one second, listen to my question. I thought you said that Hitt, and we understand he was at the June evaluation. I thought you said that he looked at the March, was at the June, thought there was something wrong, went to Santiago and Santiago agreed there should be further testing. But I don't think that's correct. I think what you said after that is that this was after the March testing. Let me explain. What's missing in this is that and what was brushed over by counsel, there were three events, March, middle of May, and then June. Going to the earlier judge's question about the cuts in the roof on the June test, that was the same roof that Major tested on in May. Those cuts were made during the May testing. They brought him back to the same roof. It's a tight roof. There wasn't a lot of uncut space left. So not only was it too steep for a seasoned firefighter, but the locations that were available to Major in June were very constricted. That's why they put the ladders up the one time to have him in June make a cut on his left side at the edge of a roof because that was the only uncut area available. That was that they chose. With regard to the sequence of events, by the time Pitt got to Santiago with his evaluation of what had happened in March, they had already done the May second round of testing and Santiago said no, we're going to stick by even though there were problems in March. He basically got retested. He failed. We're going to stick with our termination decision, which is what they made in May. It was at the end of May, going to the other questions, that there were two meetings, May 29th and May 31st. May 29th was city council members, May 31st directly with the mayor and the safety director. At that point in time, it was determined that Major would be given a third opportunity. So to the judge's question, did they know, did Major have some idea in May that he was going to be retested on the same roof in June? No, he was told he was being terminated. It was only after the outcry of actual discrimination in those meetings are documented. You must please read the affidavit of Dr. Murray, Professor Emeritus Murray and the affidavits of Paula Hicks Hudson, Tim Ross and the testimony of Chief Hitt, which all evidence that the city itself, through the safety director and the mayor acknowledged publicly that there were problems with discrimination in the fire department and that discrimination was being perpetrated directly against Major Smith. That was directly talked about, admitted to and that's why they did the June evolution. That's why they appointed Hitt to observe the June evolution and if you want the best evidence of pretext, it's that no one, not Santiago, not subsequent Chief Byrd, not the mayor, no one ever even asked Chief Hitt what happened in June. No one ever read his report before he was terminated. They had their pretext. He failed. Council Charles just says it's simple. It's a route. It's a test. Everybody takes a test on a route. They don't want to deal with the details of the test. But if the test isn't different, then it can't be pretext, right? Hitt says the March roof was too hard. There were problems with the March test but the March test was the same test for everybody in his squad, right? He doesn't say the March test was too hard. He says that there were inconsistencies in the way he was trained and tested in March which justified another evolution and the city itself gave him another evolution. The March test, if you look at Chief Hitt's testimony, he talks about, he details the conditions of the June test. Those are totally distinct, different from the conditions, any evidence of the conditions that have occurred in March. If nothing else, this is a summary judgment case, that the decision as to what were the actual facts requires a weighing of the evidence and determinations of credibility. Who to believe? Counsel Charles says, don't believe what Abood is telling you. Don't believe what Hitt is telling you. That's not the subject of summary judgment. What did Smith say about the two roofs? He was somewhat nondescript. He ultimately says that he recognized, as Jeff Charles says, nobody measures these roofs. He says that he but he's a trainee. He's not experienced in, oh, is this too steep for this kind of a maneuver? Now he says it was too steep, but the judge disregards that. The district court judge looks at the pictures. I address this in my brief. You can't take pictures. Pictures can be manipulated. He was put on a roof that an experienced head of the training academy testifies was too steep for any seasoned firefighter. That in itself evidences that this was different conditions. Chief Hitt's report details that the protocol for doing this type of training and testing is dictated by national and state certification standards and the city puts their own twist on certain things. However, you still have to meet those conditions of consistency and fairness. And he says specifically, and he details why that the June evolution was not up to those standards. That's the comparison. Was Nathan Smith fairly trained and tested in June according to those standards? He was not. Was he fairly tested and trained consistently with the March test? No, he was not. Any conclusion to the other contrary requires a weighing of the evidence. Your time is up. Any other questions from my colleagues? Thank you both. The case will be submitted.